**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

TERESA M.,[1]                    ) Case No. CV 20-1212-JPR
                                 )
                Plaintiff,       )
                                 ) **MEMORANDUM DECISION AND ORDER**
        v.                       ) **AFFIRMING COMMISSIONER**
                                 )
KILOLO KIJAKAZI, Acting          )
Commissioner of Social           )
Security,[2]                     )
                                 )
                Defendant.       )
_____  )

I.   **PROCEEDINGS**

     Plaintiff seeks review of the Commissioner's final decision
denying her applications for Social Security disability insurance
("DIB") and supplemental security income benefits ("SSI").  The
matter is before the Court on the parties' Joint Stipulation,
filed November 11, 2020, which the Court has taken under

_____

     [1] Plaintiff's name is partially redacted in line with
Federal Rule of Civil Procedure 5.2(c)(2)(B) and the
recommendation of the Committee on Court Administration and Case
Management of the Judicial Conference of the United States.

     [2] Kilolo Kijakazi, who was appointed acting commissioner on
July 9, 2021, is substituted in as the correct Defendant.  See
Fed. R. Civ. P. 25(d).

submission without oral argument. For the reasons discussed below, the Commissioner's decision is affirmed.

## II. BACKGROUND

Plaintiff was born in 1971. (Administrative Record ("AR") 154, 158.) She completed some high school and worked part time as a retail sales clerk and home-care provider. (AR 41, 47-48, 178, 190.)

On January 19 and October 16, 2018, Plaintiff applied for DIB and SSI, respectively, alleging that she was unable to work because of a heart condition, "lung problems," hysterectomy, fibromyalgia, stress, and depression. (AR 154, 158, 177.) The DIB application alleged that she had been unable to work since April 28, 2017, but the SSI application said January 1 of that year. (AR 154, 159.) After her applications were denied (AR 72-86, 89-93), she requested a hearing before an Administrative Law Judge (AR 94-95). One was held on August 23, 2019, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert. (See AR 37-51.) In a written decision issued September 11, 2019, the ALJ found Plaintiff not disabled. (AR 17-31.) She sought Appeals Council review (AR 149-52), which was denied on December 18, 2019 (AR 1-6). This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence

means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is "more than a mere scintilla, but less than a preponderance."  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."  Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's.  Id. at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for Social Security purposes if they can't engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   The Five-Step Evaluation Process

An ALJ follows a five-step sequential evaluation process to assess whether someone is disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the

3

Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting the claimant's ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. §§ 404.1520(a)(4)(ii) & (c), 416.920(a)(4)(ii) & (c).

If the claimant has a severe impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded. §§ 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d).

If the claimant's impairment or combination of impairments does not meet or equal one in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[3] to perform the claimant's past work; if so, the claimant is not disabled and the

---

[3] RFC is what a claimant can do despite existing exertional and nonexertional limitations. §§ 404.1545(a)(1), 416.945(a)(1); see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

claim must be denied.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).
The claimant has the burden of proving inability to perform past
relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets
that burden, a prima facie case of disability is established.
Id.

If that happens or if the claimant has no past relevant
work, the Commissioner bears the burden of establishing that the
claimant is not disabled because the claimant can perform other
substantial gainful work available in the national economy, the
fifth and final step of the sequential analysis.
§§ 404.1520(a)(4)(v), 404.1560(c), 416.920(a)(4)(v), 416.960(c).

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since April 28, 2017, the alleged
DIB-application onset date;[4] he found her date last insured to be
December 31, 2021.  (AR 19-20.)  At step two, he determined that
she had severe impairments of fibromyalgia, rheumatoid arthritis,
degenerative disc disease of the lumbar spine, asthma, "chest
pain syndrome," obesity, and depression.  (AR 20.)

At step three, he found that Plaintiff's impairments did not
meet or equal any of the impairments in the Listing.  (Id.)  At
step four, he determined that she had the RFC to perform light
work with the following limitations: "frequent pushing and
pulling with bilateral upper and lower extremities" and "overhead

---

[4] The ALJ stated that "[i]n both applications, [Plaintiff]
alleged disability beginning April 28, 2017."  (AR 17.)  But as
previously noted, the SSI application alleged that she became
unable to work on January 1, 2017.  (AR 154, 159.)

reaching bilaterally"; "occasional postural activities"; no
"climbing ladders, ropes, and scaffolds"; no "concentrated
exposure to pulmonary irritants" or "extreme temperatures"; no
"work with unprotected heights"; and "limited to non-complex
routine tasks." (AR 22.) She could not perform any of her past
relevant work (AR 29), but she could work as a merchandise
marker, office helper, or information clerk, positions that
"exist[ed] in significant numbers in the national economy" (AR
30). Accordingly, he found her not disabled. (AR 30-31.)

**V. DISCUSSION**

Plaintiff alleges that the ALJ erred in assessing the
medical opinions, evaluating her subjective symptom statements,
and finding that she could perform jobs with DOT descriptions
that conflicted with the RFC. (See J. Stip. at 5-9, 23-32, 36-
41, 46-51, 57-59.) For the reasons discussed below, remand is
not warranted.

    A.   The ALJ Properly Evaluated the Medical Opinions

        1.   Relevant background

            a.  *Ijeoma Ijeaku*

On May 12, 2018, consulting psychiatrist Ijeoma Ijeaku
conducted a complete psychiatric evaluation of Plaintiff. (AR
684-88.) She complained of depression and fatigue. (AR 684.)
She reported that she had been well until her mother passed away,
in fall 2016. (Id.) She had never been admitted to a
psychiatric hospital. (Id.) In fact, although she had been
prescribed psychotropic medications by her primary-care
physician, she had never been evaluated by a psychiatrist or
therapist. (Id.)

During a mental-status examination, she cooperated and had fair eye contact and normal tone, volume, and rate of speech. (AR 686.) She reported that her mood was sad, but her affect was appropriate, there was no psychomotor retardation, and she denied any suicidal or homicidal plans or thoughts. (Id.) Her thought process was goal directed, and she did not exhibit looseness of association, thought disorganization, flight of ideas, thought blocking, tangentiality, or circumstantiality. (Id.) She exhibited no delusions and denied "thought broadcasting" and "insertion";[5] phobias; obsessions; "derealizations";[6] depersonalization;[7] and auditory, visual, tactile, or olfactory hallucinations. (Id.) Her concentration was fair and her memory good. (Id.) She was alert and oriented to date, place, and person. (Id.) She was able to recall three of three objects in five minutes; what she had for breakfast, lunch, and dinner; and her date of birth. (Id.) She was able to spell the word "world"

[5] Thought broadcasting is the delusion that one's thoughts are being disseminated for all to hear. Thought Broadcasting, APA Dictionary of Psych., https://dictionary.apa.org/thought-broadcasting (last visited July 12, 2021). Thought insertion is a delusion that thoughts ascribed to outside sources have been forced into one's mind. Thought Insertion, APA Dictionary of Psych., https://dictionary.apa.org/thought-insertion (last visited July 12, 2021).

[6] Derealization is feeling detached from one's surroundings. Derealization Explained, WebMD, https://www.webmd.com/mental-health/mental-derealization-overview (last visited July 12, 2021).

[7] Depersonalization is feeling disconnected or detached from one's body and thoughts. Mental Health and Depersonalization Disorder, WebMD, https://www.webmd.com/mental-health/depersonalization-disorder-mental-health (last visited July 12, 2021).

forward and backward, but she was unable to perform serial sevens or threes. (Id.) Her interpretation of proverbs, her insight, and her judgment were fair. (Id.) She was diagnosed with "dependent disorder," not otherwise specified, and was assigned a GAF score of 58.[8] (AR 686-87.)

Dr. Ijeaku opined that Plaintiff was mildly limited in the ability to understand, remember, and carry out simple instructions. (AR 687.) She was moderately limited in the ability to understand, remember, and carry out complex instructions; maintain concentration, "attendance,"[9] and persistence; perform activities within a schedule and maintain regular attendance; complete a normal workday or workweek without interruption from psychiatric symptoms; and respond appropriately to changes in a work setting. (Id.)

---

[8] GAF scores assess a person's overall psychological functioning on a scale of 1 to 100. See Diagnostic and Statistical Manual of Mental Disorders 32 (revised 4th ed. 2000). A GAF score between 51 and 60 describes "moderate symptoms" or any moderate difficulty in social, occupational, or school functioning. Garrison v. Colvin, 759 F.3d 995, 1023 n.4 (9th Cir. 2014). The Commissioner has declined to endorse GAF scores, see Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50764-65 (Aug. 21, 2000) (codified at 20 C.F.R. pt. 404) (GAF score "does not have a direct correlation to the severity requirements in our mental disorders listings"), and the most recent edition of the DSM "dropped" the GAF scale, citing its lack of conceptual clarity and questionable psychological measurements in practice, see DSM-V 16 (5th ed. 2013). Because GAF scores continue to be included in claimant medical records, however, the Social Security Administration has clarified that they are medical opinion evidence if they come from an acceptable medical source. Wellington v. Berryhill, 878 F.3d 867, 871 n.1 (9th Cir. 2017).

[9] As discussed later, this was most likely a scrivener's error and was meant to read "attention."

1          b.   *Arthur Lewy*

2          Psychologist Arthur Lewy reviewed portions of Plaintiff's

3  medical records on initial determination.  (AR 53-62.)  He

4  observed that although she received medication therapy for

5  depression, she had "no acute mental complaints."  (AR 62.)  Nor

6  did her treating source have any "psych[iatric] concerns."  (Id.)

7  The "available observations [were] benign," "most limitations

8  appear[ed] due to physical ailments," she claimed to pay good

9  attention, she was "independent in her" activities of daily

10  living, she had "positive relations with family," and her "social

11  skills with medical encounters [were] intact."  (Id.)  She was

12  observed on one occasion to be "off topic," but she "managed [her

13  face-to-face] interview . . . without difficulties," and a prior

14  neurological consultative examination noted "no concerns about

15  cognition."  (Id.)  Therefore, Dr. Lewy found that some of Dr.

16  Ijeaku's findings were "at odds with the rest of the records,

17  especially those suggesting reduced cognitive abilities."  (Id.)

18  He further noted that "[e]ven the expressions of sadness" at the

19  consultative examination were "at odds with available . . .

20  records."  (Id.)  Although there was no indication of reduced

21  cognition, Dr. Lewy found that there might be "reduced cognitive

22  efficiency in the context of heightened affect, especially in the

23  context of physical discomfort."  (Id.)  Nevertheless, he found

24  that Plaintiff "appear[ed] to self manage adequately," exhibited

25  "no indications of needs for higher level psych interventions,"

26  and "retained" "the capacities needed for work involving basic

27  and familiar detailed tasks in a predictable setting."  (Id.)

28          He opined that she had no limitations in understanding and

9

memory; was not significantly limited in the ability to carry out
very short and simple instructions, maintain attention and
concentration for extended periods, sustain an ordinary routine
without special supervision, make simple work-related decisions,
complete a normal workday and workweek without interruptions from
psychologically based symptoms, perform at a consistent pace
without an unreasonable number and length of rest periods, ask
simple questions or request assistance, accept instructions and
respond appropriately to criticism from supervisors, maintain
socially appropriate behavior and adhere to basic standards of
neatness and cleanliness, be aware of normal hazards and take
appropriate precautions, travel in unfamiliar places or use
public transportation, and set realistic goals or make plans
independently of others; and was moderately limited in the
ability to carry out detailed instructions, perform activities
within a schedule, maintain regular attendance, be punctual
within customary tolerances, interact appropriately with the
general public, and respond appropriately to changes in the work
setting. (AR 67-68.)[10]

          c. *Seung Ha Lim*

Plaintiff saw internist Seung Ha Lim in March 2018 for an
internal-medicine consultation. (AR 691-95.) Plaintiff reported
a history of chest, neck, back, and joint pain; pulmonary
embolism; and fibromyalgia. (AR 691.) She complained of

---

[10] Plaintiff claims that Dr. Lewy "found that [she] had a
depressive, bipolar and related disorder classified under Listing
12.04," citing AR 63. (See J. Stip. at 5.) That is not
accurate. AR 63 says merely that that Listing was "considered."

shortness of breath but denied coughing up blood.  (Id.)  An examination revealed Jamar dynamometer grip-strength test results of 55 pounds of force in the right (dominant) hand and 20 in the left.[11]  (AR 693.)  Otherwise her strength was 5/5 without focal motor deficits.  (AR 694.)  She was well developed, well nourished, and in no acute distress; had a slow gait; and complained of back pain.  (AR 693)  Dr. Lim noted normal range of neck motion, but Plaintiff exhibited pain on motion.  (Id.)  Her lungs were "clear to auscultation"[12] bilaterally, and there was normal "excursion with respirations."[13]  (Id.)  Her spine curvature was normal, but she had pain on motion, paravertebral tenderness, decreased range of motion of the back, and multiple points that were tender to palpation.  (AR 694.)  She had pain on motion of the knees and wrists but normal range of motion.  (Id.)  The range of motion of the rest of the joints of the upper and lower extremities was within normal limits bilaterally.  (Id.)  Her sensation was grossly intact to soft touch throughout the

---

[11] A "normal" grip strength for a woman between 45 and 49 years old, as was Plaintiff (AR 154, 158), is between 18.6 and 32.4 kilograms, or between 41.01 and 71.43 pounds.  See Grip Strength Ratings for Females, Topendsports, https://www.topendsports.com/testing/norms/handgrip.htm (last visited July 12, 2021); Convert Kilograms to Pounds, Calculateme, https://www.calculateme.com/weight/kilograms/to-pounds/ (last visited July 12, 2021).

[12] Lung auscultation is listening to the lungs, usually with a stethoscope, during breathing.  Breath Sounds, MedlinePlus, https://medlineplus.gov/ency/article/007535.htm (last visited July 12, 2021).

[13] Diaphragmatic excursion is the movement of the diaphragm during exhalation and inhalation.  Diaphragmatic Excursion, Free Dictionary, https://medical-dictionary.thefreedictionary.com/diaphragmatic+excursion (last visited July 12, 2021).

upper and lower extremities bilaterally.  (Id.)  Her deep-tendon
reflexes were 2/2 and symmetrical throughout.  (Id.)

Dr. Lim assessed her with a history of chest pain, pulmonary
embolism, fibromyalgia, neck and back pain, and generalized joint
pain.  (Id.)  Dr. Lim opined that she was restricted to standing
and walking "about six hours" and sitting six hours in an eight-
hour workday; lifting or carrying 20 pounds occasionally and 10
pounds frequently; bilateral pushing, pulling, and overhead
reaching frequently; and climbing, crouching, stooping, crawling,
and kneeling occasionally.  (AR 695.)

#### d. *E. Christian*

Some of Plaintiff's medical records were evaluated on June
4, 2018, by state-agency reviewer Dr. E. Christian, who used a
medical specialty code of 19 (AR 71), indicating internal
medicine, see Soc. Sec. Admin., Program Operations Manual System
(POMS) DI 24501.004 (May 5, 2015), https://secure.ssa.gov/apps10/
poms.nsf/lnx/0424501004.  The doctor opined that Plaintiff had
degenerative disc disease, chronic pulmonary heart disease, and
asthma (AR 61) and had the RFC to perform light work with some
additional limitations (AR 64-66).  She could stand or walk about
six hours in an eight-hour workday; sit for about six hours in an
eight-hour workday; occasionally climb ramps, stairs, ladders,
ropes, and scaffolds; and occasionally balance, stoop, kneel,
crouch, and crawl.  (Id.)  She was prohibited from concentrated
exposure to extreme cold.  (AR 66.)

#### e. *James Song*

On May 24, 2019, internist James Song completed a "Residual
Functional Capacity Assessment Form."  (AR 860.)  He stated that

12

he had treated Plaintiff every month for the past two years. (Id.)  He diagnosed her with high blood pressure, rheumatoid arthritis, fibromyalgia, pulmonary embolism, and "abdormal [sic] . . . coronary arteries." (Id.)  He opined that she could stand or walk one hour in an eight-hour day and sit for four hours in an eight-hour day. (Id.)  She had unspecified limitations in pushing, pulling, stooping, and bending and would need to be absent from work more than four days a month.  (Id.)

2.  Applicable law

For claims like Plaintiff's filed on or after March 27, 2017, the rules in §§ 404.1520c and 416.920c, governing evaluation of medical opinions, apply.  (AR 154, 177); see §§ 404.1520c, 416.920c (evaluating opinion evidence for claims filed on or after Mar. 27, 2017).  The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." §§ 404.1520c(a), 416.920c(a).  Thus, the new regulations eliminate what was customarily known as the treating-source or treating-physician rule.[14]  See §§ 404.1520c, 416.920c.

---

[14] The relationship between the medical source and the plaintiff remains a factor in considering a medical opinion, however.  See §§ 404.1520c(c)(3) (listing "Relationship with the claimant" as factor), 416.920c(c)(3) (same).  Thus, the new regulations still acknowledge that a "medical source may have a better understanding of [a plaintiff's] impairment(s) if he or she examines [plaintiff] than if the medical source only reviews evidence in [a plaintiff's] folder." §§ 404.1520c(c)(3)(v), 416.920c(c)(3)(v).  Accordingly, although the new regulatory

(continued...)

The revised rules require ALJs to evaluate the "persuasiveness" of medical opinions according to the following factors: supportability; consistency; relationship with the plaintiff;[15] specialization; and other factors, such as the medical source's familiarity with evidence in the record and with disability-program requirements. See §§ 404.1520c(c), 416.920c(c). The most important of these factors are supportability and consistency. §§ 404.1520c(b)(2), 416.920c(b)(2). The supportability factor recognizes that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support [the source's] medical opinion(s) . . . the more persuasive [they] will be." §§ 404.1520c(c)(1), 416.920c(c)(1). Similarly, consistency is the extent to which an opinion is consistent with the "evidence from other medical sources and nonmedical sources." §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ should explain how he considered the supportability and consistency factors in assessing a medical opinion and "may, but [is] not required to, explain how [he] considered the [other] factors . . . as appropriate." §§ 404.1520c(b)(2), 416.920c(b)(2).

The ALJ may discount a physician's opinion regardless of

---

[14] (...continued)
scheme does not give "controlling weight" to any medical opinion, neither does it place all medical opinions on an equal footing, as Defendant suggests. (J. Stip. at 20.)

[15] The relationship-with-plaintiff factor combines consideration of length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and existence of an examining relationship. §§ 404.1520c(c)(3), 416.920c(c)(3).

whether it is contradicted. <u>Magallanes v. Bowen</u>, 881 F.2d 747,
751 (9th Cir. 1989); <u>see also</u> <u>Carmickle v. Comm'r, Soc. Sec.
Admin.</u>, 533 F.3d 1155, 1164 (9th Cir. 2008). The Ninth Circuit
has required that when a doctor's opinion is not contradicted by
other medical-opinion evidence, it may be rejected only for a
"clear and convincing" reason. <u>Magallanes</u>, 881 F.2d at 751;
<u>Carmickle</u>, 533 F.3d at 1164 (citing <u>Lester</u>, 81 F.3d at 830-31).
When it is contradicted, the ALJ need provide only a "specific
and legitimate" reason for discounting it. <u>Carmickle</u>, 533 F.3d
at 1164 (citing <u>Lester</u>, 81 F.3d at 830-31).[16]

### 3. The ALJ's assessment of the doctors' opinions

The ALJ found Dr. Ijeaku's and Dr. Lewy's opinions "somewhat
persuasive." (AR 28.) He found persuasive Dr. Ijeaku's opinion
that Plaintiff had moderate limitations in the ability to
understand, remember, and carry out complex instructions and the
ability to maintain concentration, "attendance," and persistence
and Dr. Lewy's opinion that she had moderate limitations in the
ability to carry out detailed instructions. (<u>Id.</u>) He found
"unpersuasive" Dr. Ijeaku's opinion that Plaintiff had moderate

---

[16] Defendant argues that the Court should no longer apply
the "clear and convincing" and "specific and legitimate"
standards in light of the new regulations. (J. Stip. at 20-21.)
The Ninth Circuit has not yet indicated whether it will continue
to draw such distinctions in analyzing medical opinions. <u>See</u>
<u>Allen T. v. Saul</u>, No. EDCV 19-1066-KS, 2020 WL 3510871, at *3
(C.D. Cal. June 29, 2020). As Defendant acknowledges, however,
it continued to apply these standards even after the Commissioner
implemented other new regulations concerning how medical opinions
were to be evaluated. (<u>See</u> J. Stip. at 20 (citing
§§ 404.1527(c)(2), 416.927(c)(2))); <u>Lester</u>, 81 F.3d at 830. The
Court need not resolve this question here because as explained
below, the ALJ properly applied the new regulations and his
reasons were clear and convincing.

limitations in the ability to perform activities within a
schedule and maintain regular attendance, complete a normal
workday without interruption, and appropriately respond to
changes in a work setting and Dr. Lewy's opinion that she had
moderate limitations in the ability to perform activities within
a schedule, interact appropriately with the general public, and
respond appropriately to changes in the work setting. (Id.) The
ALJ noted that Plaintiff testified that she was able to attend
church weekly, handled changes in routine "fine," and finished
what she started. (AR 28-29 (citing AR 46, 221-22, 235-36).)

He found Dr. Lim's and Dr. Christian's opinions "persuasive"
and noted their support in the record, which did not show
symptoms, objective medical abnormalities, diagnoses, or
treatment consistent with the severity of symptoms Plaintiff
alleged. (AR 27.) He also noted that her treatment plans
consisted only of pain management with medication, and her
activities of daily living indicated that she was more functional
than alleged. (AR 27-28.)

The ALJ found Dr. Song's opinions "unpersuasive" because
they were "overly restrictive" and "inconsistent with the
objective findings" of Drs. Lim and Christian and with
Plaintiff's "own statements that she [could] mop, sweep, and do
dishes." (AR 28.)

        4.  Analysis

Plaintiff asserts that the ALJ erred in assessing the
medical opinions of Drs. Ijeaku, Lewy, Lim, Christian, and Song.
(See J. Stip. at 5-9, 23-32, 36-38.) But the ALJ correctly used
the "persuasive" terminology of the new regulations throughout

16

his decision, properly discussed the supportability and consistency of the opinions in the context of the other evidence, and noted that he was not providing "articulation about the evidence that [was] inherently neither valuable nor persuasive in accordance with 20 CFR 404.1520b(c) and 416.920b(c)," the new regulations explaining how the Commissioner considers medical-opinion evidence. (AR 28-29); see §§ 404.1520b(c), 416.920b(c). There was no error.

### a. *Dr. Ijeaku*

Plaintiff argues that although the ALJ found persuasive Dr. Ijeaku's opinion that she has moderate limitations in the ability to maintain "concentration, attendance, and persistence," the RFC failed to capture those limitations. (J. Stip. at 7-8.) To start, the ALJ specifically found unpersuasive Dr. Ijeaku's opinion that Plaintiff's ability to maintain regular attendance was moderately limited. (AR 28.) The earlier reference to "attendance" with "concentration" and "persistence" likely was a scrivener's error and should have read "attention." In any event, the ALJ reasonably found the attendance limitation unpersuasive because it wasn't supported by or consistent with other record evidence, as explained below.

And the ALJ adequately accounted for Plaintiff's moderate limitations in concentration and persistence by limiting her to noncomplex, routine tasks. (AR 22, 29.) The Ninth Circuit has repeatedly held that a "moderate" limitation in areas like concentration and persistence translates into the type of RFC the ALJ assessed here. See, e.g., Shoemaker v. Berryhill, 710 F. App'x 750, 751 (9th Cir. 2018) (ALJ's translation of moderate

difficulties with concentration, persistence, and pace into RFC to perform "simple, routine tasks" was rational interpretation of plaintiff's self-reported limited capacity); Turner v. Berryhill, 705 F. App'x 495, 498 (9th Cir. 2017) (RFC limiting plaintiff to simple, repetitive tasks was consistent with opinion that plaintiff had moderate difficulties in concentration, persistence, and pace); Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1173-74 (9th Cir. 2008) (ALJ reasonably translated finding that plaintiff was "moderately limited" in several mental-functioning areas into RFC to perform "simple, routine, repetitive" work).

The ALJ reasonably assessed as unpersuasive Dr. Ijeaku's opinions that Plaintiff had moderate limitations in the ability to perform activities within a schedule, maintain regular attendance, complete a normal workday without interruption, and respond appropriately to changes in a work setting. (See AR 28.) The supportability and consistency factors weigh against these opinions because they were inconsistent with Plaintiff's testimony that she was able to attend church weekly and her statements that she handled changes in routine "fine" and finished what she started, as the ALJ noted. (AR 28-29 (citing AR 221-22, 235-36).) Plaintiff argues that her statement that she handles change "fine" assumed that she had experienced changes in her routine since ceasing work, a "fact not in evidence." (J. Stip. at 8.) But she made the statement without qualification on February 12, 2018 (AR 222, 236), after she had stopped working. And although she stated that she was good at paying attention and following instructions when she was not

18

taking her medication, her statement that she finished what she started was not so qualified.[17]  (AR 221, 235.)  The ALJ properly considered the most important factors, supportability and consistency, in evaluating Dr. Ijeaku's opinion. §§ 404.1520c(b)(2), 416.920c(b)(2).  There was no error.

### b.  *Dr. Lewy*

Plaintiff did not include Dr. Lewy in her statement of disputed issues but discussed his opinions with Dr. Ijeaku's. The ALJ found unpersuasive Dr. Lewy's opinions that Plaintiff had moderate limitations in the ability to perform activities within a schedule, interact appropriately with the general public, and respond appropriately to changes in the work setting.  (AR 28 (citing AR 68).)  To the extent Plaintiff is challenging this finding, there was no error.  As with Dr. Ijeaku, the ALJ correctly noted Plaintiff's testimony that she was able to attend church weekly and statements that she handled changes in routine "fine" and finished what she started (AR 28-29 (citing AR 221-22, 235-36)), all of which were inconsistent with the opinions. Therefore, the ALJ found Dr. Lewy's assessments "unpersuasive." (AR 28.)  Plaintiff has unearthed no error in the ALJ's consideration of these opinions.

### c.  *Drs. Lim and Christian*

Plaintiff's only argument concerning the ALJ's assessment of

---

[17] Plaintiff claims that "Dr. Ijeaku did not assume a pattern of activity different that [sic] that found by the ALJ to be true" and thus the ALJ erred in rejecting some of the doctor's assessed limitations.  (J. Stip. at 9.)  But in fact, Dr. Ijeaku "recorded daily activities as very minimal" (id. at 8 (citing AR 685)), whereas the ALJ found that Plaintiff engaged in a wide range of daily activities, as discussed infra in section V.B.4.b.

the opinions of Drs. Lim and Christian is that he failed to expressly state in the RFC that Plaintiff could "stand/walk not more than six hours in an eight-hour day." (J. Stip. at 30-31.) She acknowledges that SSR 83-10, 1983 WL 31251 (Jan. 1, 1983), governing the capability to do other work, contains a standing or walking limitation. (J. Stip. at 30.) That ruling provides that

> the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time.

SSR 83-10, 1983 WL 31251, at *6. But she argues that the ALJ should have specifically included a standing and walking limitation in his questioning of the VE and in the RFC because the regulatory and DOT definitions of light work do "not impose a limitation in standing/walking or necessarily permit the ability to sit for at least two hours in an eight-hour day." (J. Stip. at 30.)

Appendix C of the DOT provides that a job is "light" "when it requires walking or standing to a significant degree." 1991 WL 688702 (Jan. 1, 2016). The regulations define light work as requiring "a good deal of walking or standing." §§ 404.1567(b), 416.967(b).

At the hearing, the ALJ asked the VE to assume a hypothetical worker who "would be limited to light w[o]rk as decided in the regulations," with some additional limitations.[18]

_____

[18] Notably, although Plaintiff's attorney posed a hypothetical question to the VE assuming a person who could sit
(continued...)

(AR 48.)  The VE answered that this hypothetical person could work as a merchandise marker, office helper, or information clerk.  (AR 48-49.)  The ALJ was not required to spell out the standing and walking limit because it was implicit in "light work."  See Terry v. Saul, 998 F.3d 1010, 1013 (9th Cir. 2021) (ALJ's hypothetical to VE was not incomplete because VE would have understood ALJ's use of "medium work" to imply SSR 83-10's six-hour standing and walking limitation); Mitzi D. v. Saul, No. SA CV 18-01065-DFM, 2019 WL 8112507, at *2 (C.D. Cal. Dec. 13, 2019) ("Given that SSR 83-10 has been in play for over thirty years, there is no reason to think the VE understood light work to encompass anything other than approximately six hours of standing or walking.").[19]

Plaintiff also appears to argue that the intermittent-sitting language of SSR 83-10 implies that some standing must

_____

[18] (...continued)
four hours and stand one hour in an eight-hour day (AR 50), the attorney did not raise any objection to the ALJ's hypothetical or seek to clarify the meaning of light work when the ALJ framed the hypothetical (see AR 48-49).

[19] Citing Kisor v. Wilkie, 139 S. Ct. 2400 (2019), Plaintiff argues that the DOT is "not a product of the Commissioner" and that the agency cannot demand deference to its interpretation of it.  (J. Stip. at 30.)  But Kisor did not reject the traditional deference given to agency interpretations.  Instead, it held that such "deference retains an important role in construing agency regulations."  Kisor, 139 S. Ct. at 2408.  And as noted, even if SSR 83-10 were not entitled to deference, the VE would have understood the ALJ's use of the term "light w[o]rk as decided in the regulations" to imply SSR-83-10's standing and walking limitation.  The VE testified based on that understanding that Plaintiff could perform work existing in significant numbers in the national economy.  (AR 48-49.)  Therefore, the ALJ's finding was supported by substantial evidence.

21

occur in the remaining two hours of the workday. (J. Stip. at 30.) Although the language of SSR 83-10 is not as clear as one would hope, this interpretation is incorrect. Numerous courts have interpreted SSR 83-10 to entail the ability to stand and walk for a total of six hours, not more. See, e.g., Lawson v. Saul, 3:19-cv-00045-W-JLB, 2020 WL 6055148, at *3-4 (S.D. Cal. Oct. 13, 2020) (rejecting argument that language in SSR 83-10 that "sitting may occur intermittently during the remaining time" implies person may be required to stand for two remaining hours); James T. v. Saul, No. 2:18-cv-08794-KES, 2019 WL 3017755, at *2 (C.D. Cal. July 10, 2019) ("Since [SSR 83-10 was published], ALJs and VEs . . . have understood medium work as requiring the ability to stand or walk for up to 6 hours."). Tellingly, Plaintiff does not cite a single case to support her view.

Contrary to Plaintiff's argument, limiting standing or walking to six hours a workday is not inconsistent with light work. The ALJ therefore did not err in finding persuasive Drs. Lim's and Christian's opinions.

d. *Dr. Song*

The ALJ correctly found Dr. Song's opinion unpersuasive. To start, the opined limitations were "overly restrictive" and inconsistent with the objective medical evidence, as the ALJ noted. (AR 28.) Although Plaintiff exhibited some limited range of motion and slow gait, Dr. Lim observed normal muscle tone, sensation, and reflexes and no signs of radiculopathy. (AR 693-94.) And strength was 5/5 without focal motor deficits other than in the nondominant hand. (Id.) Dr. Lim noted that Plaintiff did "not require the use of assistive devices for

22

ambulation." (AR 694.) Both Dr. Lim and Dr. Christian opined that she could perform a range of light work, consistent with the RFC. (AR 64-66, 695.) And Dr. Song's own examination of Plaintiff was "grossly normal aside from numbness to toes," as the ALJ noted. (AR 24 (citing AR 628-29)); see Davis v. Commissioner Soc. Sec. Admin., 420 F. App'x 763, 764 (9th Cir. 2011) (ALJ's finding that some of treating doctors' opinions contradicted doctors' own treatment notes was specific and legitimate reason for giving opinions little weight). Therefore, the ALJ properly weighed the supportability and consistency factors in finding Dr. Song's opinion unpersuasive. (AR 28.)

Plaintiff correctly notes that the record documents gait issues in the latter part of 2018 and that in August 2019, one month before the ALJ's decision, she received a walker for assistance while hospitalized for an exacerbation of asthma. (J. Stip. at 31; see AR 709-11, 868, 871-72, 874, 879.) But at Plaintiff's hearing just a few weeks later, on August 23, there was no mention of an assistive device for ambulation (see AR 37-51) even though she was questioned about the brace she was wearing on her right hand (AR 43). And she testified that she mopped, swept, and washed dishes and clothes, which would be difficult if not impossible to do while using a walker. (AR 43-45.) Although as Plaintiff notes (J. Stip. at 32), she testified that she experienced some pain when doing those activities, she "still [did] it" and just "ha[d] to do it . . . slowly" (AR 44). Those activities were thus inconsistent with Dr. Song's opinion that she required a cane or walker, as the ALJ found. (AR 28.) At most, it appears that her gait issues improved and did not

meet the duration requirement. "Unless [the] impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months." §§ 404.1509, 416.909. Accordingly, the ALJ did not err in finding Dr. Song's opinion unpersuasive.

The ALJ properly evaluated the medical opinions.

B.    The ALJ Properly Assessed Plaintiff's Symptom Statements

1.    Applicable law

An ALJ's assessment of a claimant's allegations concerning the severity of her symptoms is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended) (citation omitted); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24, 1986). "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d at 1035-36; see also SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16, 2016). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment '[that] could reasonably be expected to produce the pain or other symptoms alleged.'" Lingenfelter, 504 F.3d at 1036 (quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). If such objective medical evidence exists, the ALJ may

24

not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Id. (emphasis in original) (quoting Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996)).

If the claimant meets the first test, the ALJ may discount the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide a "clear and convincing" reason for rejecting the claimant's testimony. Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended) (citing Lingenfelter, 504 F.3d at 1036); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014). The ALJ may consider, among other factors, the claimant's (1) reputation for truthfulness, prior inconsistent statements, and other testimony that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) daily activities; (4) work record; and (5) physicians' and third parties' statements. Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). If the ALJ's evaluation of a plaintiff's alleged symptoms is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas, 278 F.3d at 959.

2. Plaintiff's symptom statements and testimony

In her January 26, 2018 Disability Report, Plaintiff alleged that her ability to work was limited by a heart condition, lung

25

problems, a hysterectomy, fibromyalgia, stress, and depression. (AR 177; Exs. Index, ECF No. 18-7.)  In her February 12, 2018 Function Report, she alleged that she was "[c]onstantly in pain," was "always tied [sic] and sleepy," and had chest pain and "severe" body pain.  (AR 216.)  She reported that she made breakfast for her son, went to doctor's appointments, cleaned her house four days a week, and did laundry and ironing two days a week.  (AR 217-18.)  She shopped for groceries once a week and for clothing once a month.  (AR 219.)  She listed her hobbies as walking and running and said she did them "every day" but also stated that she could walk "no more than a block" and could not run.  (AR 220.)  In response to another question, moreover, she stated that she could walk two blocks before needing to rest for 30 minutes.  (AR 221.)  She stated that her back hurt and her legs got numb if she stood for a "long period of time," and she experienced shortness of breath and dizziness while walking and climbing stairs.  (Id.)  She rated her ability to pay attention and follow written and spoken instructions as "good" without her medication, which made her sleepy.  (Id.)

At the August 23, 2019 hearing, Plaintiff testified that she stopped working in 2016 because she developed shortness of breath, chest pain, weakness in her left side, and "chronic pain" "[a]ll over [her] body."  (AR 41-42.)  She testified that she had fibromyalgia and depression.  (AR 42.)  She had a machine at home for "breathing treatments every two hours."  (Id.)  The depression made her "want to die."  (Id.)  Her medications made her "tired and very shaky."  (Id.)  She testified that she had difficulty standing for a long time, could sit for one hour

before starting to feel dizzy, could lift 10 pounds, and had trouble focusing on a "video or anything like that." (AR 43-44.) She could mop, sweep, and wash dishes with breaks after 20 or 30 minutes. (AR 44.) She could not cook because of her "hand" and being "shaky." (Id.) She slept for two hours after taking her medication. (AR 45.) She drove her son to school and attended church every Sunday. (AR 46.)

### 3. The ALJ's decision

The ALJ reviewed Plaintiff's claimed limitations and found that her "medically determinable impairments could reasonably be expected to cause some symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (AR 24.) The ALJ discounted Plaintiff's subjective symptom statements because they were inconsistent with the objective medical evidence (AR 24-27) and her daily activities (AR 25-26) and because her "mostly conservative treatment" effectively controlled her symptoms (AR 25).

### 4. Analysis

Plaintiff asserts that the ALJ improperly assessed her subjective symptom statements. (J. Stip. at 38-41, 46-47.) For the reasons discussed below, the ALJ did not err.

#### a. *Medical and other evidence*

To start, the ALJ properly concluded that Plaintiff's subjective symptom statements were inconsistent with the objective medical evidence in the record. Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (finding

"conflict" with "objective medical evidence in the record" to be "specific and substantial reason[]" undermining plaintiff's allegations). For instance, the ALJ noted that although she sought treatment for asthma and chest pain, an August 2017 chest x-ray revealed normal vascularity and clear lung fields bilaterally, her cardiac and mediastinal silhouettes[20] were within normal limits, the bony thorax appeared unremarkable, and she was assessed with "no acute cardiopulmonary disease." (AR 25 (citing AR 483).) Moreover, despite presenting with "recurrent chest pain symptoms" in January 2018, a physical examination revealed normal findings, including regular cardiovascular rate and rhythm and clear lungs. (AR 26 (citing AR 575).)

Similarly, the ALJ correctly noted that an echocardiogram report and exercise stress report from April 2017 revealed mostly normal findings. (Id. (citing AR 588-89).) There was trace mitral regurgitation,[21] mild tricuspid regurgitation,[22] and

---

[20] A cardiac silhouette is an outline of the heart as seen on frontal and lateral chest radiographs. Cardiac Silhouette, Radiopaedia, https://radiopaedia.org/articles/cardiac-silhouette (last visited July 12, 2021). Its size and shape provide useful clues for underlying disease. Id.

[21] Mitral regurgitation occurs when the heart's mitral valve won't close tightly, letting blood flow backward. Mitral Valve Regurgitation, Mayo Clinic, https://www.mayoclinic.org/ diseases-conditions/mitral-valve-regurgitation/symptoms-causes/ syc-20350178 (last visited July 12, 2021).

[22] Tricuspid regurgitation is a failure of the valve between the two right heart chambers to close properly, allowing blood to flow back into the heart's upper right chamber. Tricuspid Valve Regurgitation, Mayo Clinic, https://www.mayoclinic.org/ diseases-conditions/tricuspid-valve-regurgitation/ symptoms-causes/syc-20350168 (last visited July 12, 2021).

abnormal retrograde flow[23] seen parallel to the pulmonary artery. (AR 588.)  Although there was hyperdynamic left ventricular contractility[24] with an ejection fraction[25] of 75 percent, this pattern was normal for Plaintiff's age.  (Id.)  Further, the left and right ventricle and atrium were normal in size; the right ventricle and left and right atrium were normal in function; and there was no evidence of aortic stenosis[26] or regurgitation, pulmonic regurgitation,[27] pericardial effusion,[28] or myocardial

---

[23] Retrograde flow is the flow of fluid in a direction opposite to that considered normal. Retrograde Flow, Free Dictionary, https://medical-dictionary.thefreedictionary.com/ retrograde+flow (last visited July 12, 2021).

[24] Hyperdynamic contractility refers to vigorous tachycardia and cardiac activity, with left ventricular walls close to touching when the heart muscle contracts. Tips & Tricks: The Big Squeeze — Cardiac Contractility and Right Ventricular Strain Assessment, Am. Coll. of Emergency Physicians, https:// www.acep.org/how-we-serve/sections/emergency-ultrasound/news/ august-2016/tips-amp-tricks-the-big-squeeze---cardiac- contractility-and-right-ventricular-strain-assessment/ (last visited July 12, 2021).

[25] Ejection fraction measures the percentage of blood leaving the heart each time it contracts. Ejection Fraction: What Does It Measure?, Mayo Clinic, https://www.mayoclinic.org/ ejection-fraction/expert-answers/faq-20058286 (last visited July 12, 2021).  A normal ejection fraction is about 50 to 75 percent. Id.

[26] Aortic stenosis is a narrow aortic valve opening.  Aortic Stenosis Overview, Am. Heart Ass'n, https://www.heart.org/en/ health-topics/heart-valve-problems-and-disease/ heart-valve-problems-and-causes/problem-aortic-valve-stenosis (last visited July 12, 2021).

[27] Pulmonic regurgitation is incompetency of the pulmonic valve, causing blood flow from the pulmonary artery into the right ventricle when the heart muscle relaxes.  Pulmonic Regurgitation, Merck Manual Pro. Version, https://

(continued...)

ischemia.[29]  (Id.)  Plaintiff exhibited atypical left arm and leg numbness during the exercise stress test, but the results were otherwise normal.  (AR 589.)

And despite Plaintiff's allegations of disabling pain, the ALJ properly found that many of her physical-examination findings were "grossly normal."  (AR 24.)  In April 2017, she saw internist Song for "persistent generalized pain."  (AR 628.) Examination revealed "numbness to toes" but otherwise normal findings.  (AR 628-29.)

In October 2017, Plaintiff saw Dr. Gerald Y. Ho[30] for lower-back pain, dyspnea, and weakness.  (AR 529.)  On examination, Plaintiff was well developed and in no acute distress.  (AR 530.) She had tenderness to palpation but no deformities or abnormalities of the fingers, hands, wrists, elbows, shoulders,

---

[27] (...continued)
www.merckmanuals.com/professional/cardiovascular-disorders/
valvular-disorders/pulmonic-regurgitation (last visited July 12, 2021).

[28] Pericardial effusion is the buildup of extra fluid in the space around the heart.  Pericardial Effusion, Cedars Sinai, https://www.cedars-sinai.org/health-library/
diseases-and-conditions/p/pericardial-effusion.html (last visited July 12, 2021).

[29] Myocardial ischemia occurs when blood flow to the heart wanes, preventing the heart muscle from receiving enough oxygen. Myocardial Ischemia, Mayo Clinic, https://www.mayoclinic.org/
diseases-conditions/myocardial-ischemia/symptoms-causes/
syc-20375417 (last visited July 12, 2021).

[30] Dr. Ho practices primarily rheumatology.  See Cal. Dep't Consumer Aff. License Search, https://search.dca.ca.gov (search for "Ho" under "Last Name") (last visited July 12, 2021).

lumbar spine, hips, knees, or ankles. (AR 531.) Tinel's sign,[31] bilateral straight-leg-raise test,[32] and McMurray test[33] were all negative. (Id.) Elbow and shoulder motion and shoulder abduction were normal. (Id.) She had decreased sensation in the big toes and soles bilaterally, but a motor examination "demonstrated no dysfunction." (AR 532.) Her gait, stance, and reflexes were normal. (Id.)

Plaintiff's examination with Dr. Lim in March 2018 revealed 5/5 strength without focal motor deficits other than in the nondominant hand. (AR 693-94.) She was well developed, well nourished, and in no acute distress. (AR 693.) Dr. Lim noted normal range of neck motion, but she exhibited pain on motion. (Id.) Her lungs were "bilaterally clear to auscultation," with "normal excursion with respirations." (Id.) Her spine curvature was normal. (AR 694.) She had pain on motion of the knees and wrists but normal range of motion. (Id.) The range of motion of the rest of the joints of the upper and lower extremities was within normal limits bilaterally. (Id.) Her sensation was

---

[31] Tinel's sign is positive when tapping the affected nerve produces tingling. See Tinel's Sign, Healthline, https://www.healthline.com/health/tinels-sign#test (last visited July 12, 2021).

[32] A straight-leg-raise test involves mechanical manipulation of the legs, stressing the neurological tissues in the spine; specific symptoms reported at different degrees of flexion can indicate nerve compression. See The Pain Clinic Manual 44-45 (Stephen E. Abram & J. David Haddox eds., 2d ed. 2000).

[33] The McMurray test is a "rotation of the tibia on the femur to determine injury to meniscal structures." Stedman's Medical Dictionary 1805 (27th ed. 2000).

grossly intact to soft touch throughout the upper and lower extremities bilaterally. (Id.) Her deep-tendon reflexes were 2/2 and symmetrical throughout. (Id.) Likewise, the ALJ correctly noted that she was observed numerous times throughout the record to have a normal stance and gait. (See AR 564 (Mar. 7, 2016), 556 (June 5, 2017), 548 (Aug. 16, 2017), 542 (Sept. 20, 2017), 532, (Oct. 30, 2017), 656 (Dec. 10, 2017), 524 (Dec. 19, 2017).)

Similarly, the ALJ properly rejected Plaintiff's allegation of a disabling mental impairment. Although she was assessed with depression throughout the record (see, e.g., AR 345, 603), her treatment for it was "remarkably sparse," as the ALJ noted (AR 27), and demonstrated that she was more functional than alleged. When she saw Dr. Song for depression in January 2018, she was oriented to time, place, person, and situation. (AR 603.) She had appropriate mood and affect and normal insight and judgment. (Id.) She reported to Dr. Ijeaku in May 2018 that she was well until her mother passed away, in fall 2016; had never been admitted to a psychiatric hospital; and had never been evaluated by a psychiatrist or therapist. (AR 684.) See Malloy v. Colvin, 664 F. App'x 638, 641 (9th Cir. 2016) (substantial evidence supported ALJ's discounting of plaintiff's mental symptom statements when record showed "minimal and inconsistent treatment" for psychological symptoms). During a mental-status examination, she cooperated and had fair eye contact and normal tone, volume, and rate of speech. (AR 686.) She reported that her mood was sad, but her affect was appropriate, there was no psychomotor retardation, and she denied any suicidal or homicidal

32

plans or thoughts.  (Id.)  Her thought process was goal directed, and she did not exhibit looseness of association, thought disorganization, flight of ideas, thought blocking, tangentiality, or circumstantiality.  (Id.)  She exhibited no delusions and denied "thought broadcasting" or "insertion"; phobias; obsessions; "derealizations"; "depersonalization"; and auditory, visual, tactile, or olfactory hallucinations.  (Id.) Her concentration was fair and her memory was good.  (Id.)  She was alert and oriented to date, place, and person.  (Id.)  Her interpretation of proverbs, her insight, and her judgment were fair.  (Id.)

And as the ALJ noted, Plaintiff denied any anxiety or depression at numerous times throughout the record.  (See AR 636 (Feb. 10, 2017), 628 (Apr. 18, 2017), 615 (Aug. 30, 2017), 611 (Oct. 11, 2017), 602 (Jan. 22, 2018), 715 (July 31, 2018), 748 (Jan. 11, 2019), 741 (May 23, 2019), 885 (July 30, 2019).)  On January 23, 2019, she saw a nurse practitioner for breathing difficulty with exertion and denied having any nervousness, depression, restlessness, or trouble sleeping.  (AR 808.)

Thus, the ALJ did not err in discounting Plaintiff's subjective symptom statements because they were inconsistent with the objective medical evidence in the record.

b.  *Daily activities*

The ALJ also discounted Plaintiff's subjective symptom statements because her daily activities "indicate[d] that [she was] more functional than alleged."  (AR 27.)  The ALJ noted that despite her reported pain, Plaintiff "attend[ed] church every Sunday," "dr[ove] her son to school," "clean[ed], [did] laundry,

33

iron[ed]," did "her own grocery shopping," and had "no problems
with personal care." (AR 27-28.) An ALJ may discount a
claimant's subjective symptom testimony when it is inconsistent
with her daily activities. See Molina, 674 F.3d at 1113. "Even
where those [daily] activities suggest some difficulty
functioning, they may be grounds for discrediting the claimant's
testimony to the extent that they contradict claims of a totally
debilitating impairment." Id.

Household activities do not necessarily translate to an
ability to obtain and maintain employment. See Fair, 885 F.2d at
603 (observing that "many home activities are not easily
transferable to what may be the more grueling environment of the
workplace, where it might be impossible to periodically rest or
take medication"). But if a plaintiff "is able to spend a
substantial part of [the] day engaged in . . . physical functions
that are transferable to a work setting," this "may be sufficient
to discredit an allegation of disabling excess pain." Id.
(emphasis omitted). Plaintiff's daily activities, including
mopping, sweeping, doing laundry, cleaning her house four days a
week, ironing twice a week, shopping for groceries weekly and
clothes monthly, and driving her son to and from school on a
regular schedule, were more akin to those required in a workplace
(see id. at 604 (ALJ's discounting of plaintiff's subjective
symptom testimony based on daily activities was supported by
substantial evidence when plaintiff cared for all of his personal
needs, performed routine household maintenance and shopping
chores, rode public transportation, and drove his own
automobile)); therefore, the ALJ did not err in finding these

34

activities extensive enough to contradict Plaintiff's claims of a totally debilitating impairment.  Molina, 674 F.3d at 1113.

### c.  *Conservative treatment*

The ALJ also discounted Plaintiff's subjective symptom statements because they were inconsistent with evidence that they were relatively controlled with "mostly conservative treatment that consisted of continuing pain management with medication." (AR 25 (citing AR 629 (Dr. Song noting in April 2017 that Plaintiff should continue her pain management), 545 (Dr. Ho noting in August 2017 that Lyrica was "helping pain some"), 551 (same), 534 (Dr. Ho noting in October 2017 that Lyrica was "helping" Plaintiff's fibromyalgia pain and that she was "off Gabapentin"), 526 (Dr. Ho noting in January 2018 that Lyrica was "helping" with fibromyalgia pain "better than Gabapentin"); see also AR 27 (citing AR 684 (Plaintiff reporting that she had never been admitted into psychiatric hospital or evaluated by psychiatrist or therapist and had been prescribed psychotropic medications only by her primary-care physician and pain-management doctors).)  The effectiveness of Plaintiff's fibromyalgia medication was evident in her functioning on physical examination.  (See AR 524 (gait and stance normal), 532 (same), 542 (same), 548 (same), 556 (same), 564 (same), 656 (same).)  And her psychotropic medication's efficacy was demonstrated by her repeated denial of psychiatric symptoms. (See AR 602 (Plaintiff denying current anxiety or depression), 611 (same), 615 (same), 628 (same), 636 (same), 715 (same), 741 (same), 748 (same), 885 (same).)  Her breathing issues were also quickly controlled when she sought treatment.  (See AR 474

(Plaintiff "feeling better," with "improved lung sounds," after presenting to emergency department with cough and wheezing and receiving breathing treatment).)

This evidence that Plaintiff's treatment was effective was inconsistent with completely disabling symptoms. The ALJ therefore properly considered it in discounting her symptom statements. See Presley-Carrillo v. Berryhill, 692 F. App'x 941, 945 (9th Cir. 2017) (discounting claimant's testimony concerning disabling nature of symptoms when it conflicted with evidence of daily activities and effective treatment).

Remand is not warranted on this issue.

C.    The ALJ's Finding that Plaintiff Was Limited to "Non-Complex Routine Tasks" Did Not Conflict with the DOT Descriptions of Office Helper and Merchandise Marker

Plaintiff argues that the ALJ's step-five analysis was not supported by substantial evidence because his finding that she was limited to "non-complex routine tasks" (AR 22) conflicted with the DOT descriptions of the office-helper, merchandise-marker, and information-clerk jobs he found she could perform. (J. Stip. at 47-51.) Because there was no conflict with the office-helper and merchandise-marker jobs, remand is not required.[34]

_____

[34] Plaintiff may be correct, however, that the ALJ erred in finding that she could perform the job of information clerk because the DOT describes that job as requiring reasoning level four, which is inconsistent with a limitation to simple, routine tasks. (J. Stip. at 48-49 (citing DOT § 237.367-018, 1991 WL 672187 (Jan. 1, 2016))); see Zavalin v. Colvin, 778 F.3d 842, 845-47 (9th Cir. 2015). (But see J. Stip. at 54-56 (Defendant
(continued...)

When a VE provides evidence about the requirements of a job, the ALJ has a responsibility to ask about any possible conflict between that evidence and the DOT.  See Gutierrez v. Colvin, 844 F.3d 804, 807 (9th Cir. 2016) ("If the expert's opinion that the applicant is able to work conflicts with, or seems to conflict with, the requirements listed in the Dictionary, then the ALJ must ask the expert to reconcile the conflict before relying on the expert to decide if the claimant is disabled."); see also SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000).  The conflict must be "obvious or apparent" to trigger the ALJ's obligation to inquire further, and the inquiry is "fact-dependent."  Lamear v. Berryhill, 865 F.3d 1201, 1205 (9th Cir. 2017) (citing Gutierrez, 844 F.3d at 808).

### 1. Office helper

Plaintiff acknowledges that office helper is a reasoning-level two occupation that does not raise an apparent conflict with her limitation to noncomplex work.  (J. Stip. at 49.)  Nevertheless, she argues that office helper is not "non-complex, routine work because of the variety of duties and multiple work fields required."  (J. Stip. at 50.)  But she cites no authority holding either that the office-helper job is complex or that any occupation requiring a "variety of duties and multiple work fields" is.  The VE testified that based on the DOT and her 30

_____

[34] (...continued)
arguing that Zavalin does not control.)  The Court need not resolve the issue because any error was harmless: as discussed below, the ALJ properly found that Plaintiff could perform the jobs of office helper and merchandise marker.  See Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999).

years of experience, a hypothetical person with Plaintiff's age, education, experience, and RFC could perform the office-helper job. (AR 48-49.) Absent some authority holding that someone limited to noncomplex, routine tasks is precluded from performing that job, the ALJ was entitled to rely on the VE's testimony. See Gutierrez, 844 F.3d at 808-09.

Accordingly, there was no apparent conflict between the RFC's limitation to noncomplex, routine tasks and the DOT's office-helper-job description, and the ALJ was not required to inquire. See Gutierrez, 844 F.3d at 808; Bradley v. Astrue, No. ED CV 07-1660 PJW., 2009 WL 1844357, at *2 (C.D. Cal. June 25, 2009) (holding that ability to perform simple, noncomplex work was consistent with reasoning level two).

2.    Merchandise marker

As with the office-helper job, Plaintiff acknowledges that there is no apparent conflict between the merchandise marker's reasoning-level-two requirement and the limitation to noncomplex tasks. (J. Stip. at 50-51.) But she argues that one nonetheless exists because the merchandise-marker job "has significant worker functions involving data" (id. at 51) and "[d]ata is more complicated than things" (id. at 58). She again has provided no authority so holding, and the Court has found none. Accordingly, the ALJ was entitled to rely on the VE's testimony, there was no apparent conflict, and the ALJ was not required to inquire. See Gutierrez, 844 F.3d at 806-08.

**VI.   CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g), IT IS ORDERED that judgment be entered AFFIRMING

38

the Commissioner's decision, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.

DATED: _____July 13, 2021_____

_____
JEAN ROSENBLUTH
U.S. Magistrate Judge